UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
CIVIL ACTION NO 5:11-CV-00155-GFVT-REW


PECOLA CAMPBELL AND STARSKY COOK
INDIVIDUALLY AND AS ADMINISTRATORS OF
THE ESTATE OF ROLAND CAMPBELL                                    PLAINTIFFS


v.


RONNIE J. BATSIN, Individually and as
Police Chief for Lexington-Fayette Urban County
Government Division of Police;
OFFICER DERRICK P. WALLACE; and
OFFICER MATTHEW R. SMITH, Officers of
Lexington Fayette Urban County Government Division of Police        DEFENDANTS


**MOTION AND MEMORANDUM IN SUPPORT OF
FOR PARTIAL SUMMARY JUDGMENT**

* * * * *
**INTRODUCTION**

Roland Campbell was born on July 16, 1988 to Plaintiff Pecola Campbell.  Roland was born with autism and severe cognitive disabilities.  Roland had no expressive language, either vocal or sign. He could follow one-step directions, such as "sit down."  Roland attended special-education classes during his life.  At the time of his death, he lived in a home facility owned and operated by former Defendant Adult Day Care of Lexington, Inc. (ADC).

Roland died on April 18, 2010.  He had just turned twenty-one (21) years old when he died.  The autopsy lists the following causes of death:

- Acute cardiorespiratory failure;

- Acute hypoxia;

1

- Dehydration;

- Physical exhaustion;

- Acute sympathomimetic intoxication; and,

- Autism-induced excited delirium during prone restraint.

*Autopsy of Roland Campbell* (Exhibit 1), at 8.  The medical examiner, Dr. Hunsaker, gave as his opinion that "Mr. Campbell died as a result of sudden death during prone restraint complicating excited delirium associated with the developmental disorder, autism." *Id.*

## FACTS

On April 18, 2010, at approximately 1:00 p.m., decedent Roland Campbell, a nonverbal, severely autistic, cognitively disabled young man living in an ADC group home, became agitated and angry. The attendant on duty was able to calm him, and then gave him a bath.  After his bath, he again became agitated and angry, and jumped out a window.

Despite this, the attendant waited approximately 45 minutes to call his supervisor, former defendant Eric Hatter.  After delays, Hatter eventually gave authorization for risperidone to be administered to Roland and called former Defendant Hill, one of the owners of the facility. Defendant Hill called a neighbor, who was a sergeant with the Lexington-Fayette Urban County Government police department (LFUCG).  Finally, the officer called LFUCG to dispatch officers to respond to a mentally challenged subject at an adult daycare facility. In the meantime, Hatter went to the home.

Upon arrival, Defendant Officer Derrick Wallace noted that based on the information he had, his intention was not to arrest, but to effect an "emergency detention" of Roland, for purposes of transport to Eastern State Hospital for further evaluation.  (*See* Wallace Depo., at 46).   Officer Wallace noted that Defendant Hatter appeared to have been involved in an

altercation; his shirt was torn and there "was blood on him." *Id.* at 81.  Defendant Hatter failed to provide Officer Wallace with any background information about Roland's disability or the extent and duration of the altercation between the Adult Daycare of Lexington's employees and Roland Campbell; nor did Defendant Wallace ask for any.  Instead, Officer Wallace and ADC employee Hatter proceeded through the home, which was in obvious disarray, to Roland's room. Here Officer Wallace observed Roland naked, standing against the back wall, bleeding from his hands, and staring into space, but in an apparent state of calm.  (*Id.* at 82).

Dr. Peters opined you cannot enter into this situation without informing oneself as a police officer to know the entire scope of what you are confronting as an office.  As Dr. Peters testified:  "The most important behavior issue that goes to my opinion is the fact that Mr. Hatter came outside with his shirt ripped and basically disheveled from having just dealt with Mr. Campbell.  I think that is a big behavioral queue that the officers should have keyed in on, and said to Mr. Hatter "why do you look like that."  And then . . ."I just went, you know 10 rounds with Mr. Campbell inside and he calmed down."  That is part of the event. That is part of the information that the officers should have gathered, as part of their, . . .investigation into what took place."  (Peters Depo., at 202)

Yet still uninformed as to the extent of Roland's mental disability, Defendant Wallace attempted to engage Roland verbally.  He described Roland as non-responsive, sweating heavily and not acknowledging that he (Wallace) was there. (Wallace Depo., at 58).

Defendants Wallace and Smith had both received a PowerPoint training on "sudden custody death syndrome" which stressed that a person such as he found in Roland's state was a "medical emergency."  **The PowerPoint specifically urged officers to recognize phenomena such as overheating, excessive sweating, and nudity, and counseled "avoid[ing]**

**confrontation if at all possible."** *See, e.g., Report of Dr. John Peters,* Response to Defendants' Motion to Strike, Exhibit B-2 at 9 (R. 1474).   Defendant Wallace clearly acknowledged seeing these danger signs, but did not respond appropriately.   What he did was to radio for backup (Wallace Depo. at 81), and continued to monitor Roland, confirming at this point Roland was not a danger to himself or others. Wallace continued to try to communicate with Roland, asking Roland what was bothering him and not receiving a response. (Wallace Depo. at 82-83). Wallace remained unaware of the nature of Roland's disability and that he was non-verbal.

Defendant Smith arrived as the responsive backup officer.   (*Id.* at 83).   Still neither officer inquired of Hatter, nor was information provided to them, of Roland's mental status, disability, or his inability to communicate and understand.   Hatter did ask them if they wanted him to stay in the room (E. Hatter, Depo. at 149-150); the officers assented, one saying, "If you would."   (*Id.* at 150).   Hatter was not asked to leave or stand back.   (*See, e.g.,* Wallace Depo. at 136).

Next, the Defendant officers approached and cuffed Roland behind his back, and using soft-hand restraints, attempted to walk Roland across the room.   Then, the Defendant officers, in conjunction with former Defendant Eric Hatter -- a man weighing at least 260 pounds on a six-foot frame (E. Hatter Depo. at 65) -- attempted to cover Roland with a blanket.   Roland became fidgety and agitated (Wallace Depo. at 84-85), so the officers decided to seat Roland on the floor.   They used hand restraints to keep him in a seated position, in response to which Roland rolled to his side, eventually ending in a prone restraint position.   (Wallace Depo. at 89).   Next, the struggle ensued, involving both Defendant officers and Defendant Hatter attempting to control Roland.

The uncontroverted report of Plaintiffs' expert, Dr. John Peters, describes this as an inappropriate and unnecessary escalation of the situation by the officers which caused or contributed to Roland's death. *Report of Dr. John Peters,* Response to Defendants' Motion to Strike, Exhibit B-2 at 8 (R. 1473). Dr. Nichols states categorically that the Officer's actions in reengaging Roland, ramping him into a second state of excited delirium caused his death. (Doc. 126-5, R.1565; Report of George M. Nichols).

Wallace wound up holding Roland down in the prone position, with his left arm holding down Roland's elbow and "either [his] right arm or his wrist" with his "right hand through the blanket." (Wallace Depo. at 89-90). Officer Smith, the backup, was "a hold of his feet." (*Id.* at 91). Hatter was on Roland's back or, at the very least, on Roland's legs and lower body while Roland was in prone restraint. (*Id.*; *see also Id.* at 149). During all of this, Officer Wallace testified that he was "down…in Mr. Campbell's face" attempting to reassure him. (Wallace Depo. at 92). Based on where he testified that his hands were throughout, the inescapable conclusion is that he was on top of Roland and that his weight was also on Roland.

Roland was only 5 feet, 5 ½ inches in height. (*Autopsy Report,* Exh. 1, at 11). Roland's body simply did not provide enough physical surface for the three men not to have covered Roland completely, given the positions they took.

Officer Wallace acknowledged that he had been trained not to "leave the person in a prone position," and that "it could affect the person's breathing, or it's just not a position that you want to leave somebody in…especially after a struggle." (*Id.* at 67-68). Likewise, Officer Smith testified that he had been trained that officers were always to avoid subjects' "laying on their stomach…That way they don't have any problems breathing." (Smith Depo. at 28).

The testimony of Defendants Wallace and Smith, as well as Dr. Peters' report, based on his many years of expertise and on a close review of the officers' training regimen and deposition testimony, makes clear that both Officers had at least been trained to know that prone positioning was potentially fatal. (*See, e.g*., Smith Depo. at 28).   Nonetheless,  none of them re-positioned Roland from the prone position.   Instead they continue a prone struggle with him, with the assistance of a civilian actor who got on top of Roland's mid-section to upper body. Wallace remained on top of Roland with his face near Roland's face.  Smith held his legs and his feet. This was far in excess of the force needed.  Deposition of Dr. John Peters at 220-221; *see also* Peters Report at 12-13 (R. 1485-1486).

Finally, Roland desperately reacted.  He proceeded "to pick himself and everybody off the ground with the one hand, three or four inches, . . ."  Then, according to Wallace, Roland "collapsed, and that was it…That was the last response. That was the last time [Wallace] saw his eyes open."  (Wallace Depo. at 99 -- 100).  All three -- Wallace, Smith, and Hatter -- testified that Roland exhibited classic behaviors of someone in a state of excited delirium, including bizarre, violent and/or aggressive behavior during the struggle; violence toward objects; public disrobing; superhuman strength; overheated/excessive sweat; and irrational physical behavior. Nonetheless, Officers Wallace and Smith and ADC employee Hatter continued to struggle with Roland until he raised up one last time, collapsed, and died.

When Roland collapsed, the officers attempted to get him to respond.  The three men picked Roland up, carried him into the living room of the home, and began checking for breathing and a pulse.  (*See, e.g.,* Wallace Depo. at 133).   Another police officer, Officer Bauman, began to administer CPR, along with Mr. Hatter.  (*Id.*). They were unable to revive Roland.  He was later pronounced dead.

## ARGUMENT

Section 1983 specifically authorizes "any citizen of the United States or other person within the jurisdiction thereof" to pursue "an action at law [or] suit in equity" against every person who under color of state law "causes...the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983; *Neuens v. City of Columbus,* 303 F.3d 667, 670 (6th Cir. 2002).   To state a claim under § 1983, a plaintiff must establish both that the defendant acted under color of state law and deprived him of a federal statutory or constitutional right. *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007) (*quoting Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

### The Legal Standard for Summary Judgment

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

When a Court reviews a motion for summary judgment, the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Centra, Inc., v. Eptrin*, 538 F.3d 402, 412 (6th Cir. 2008).   To prevail, the party opposing summary judgment must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 341-42 (6th Cir. 1990).   A mere scintilla of evidence is

7

insufficient, as "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**I.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF WHETHER EXCESSIVE FORCE WAS USED CAUSING THE DEATH OF ROLAND CAMPBELL.**

**A.     The officers used excessive force as defined by Supreme Court and Sixth Circuit law.**

To determine whether an officer's use of force in effecting an arrest is excessive, in violation of the Fourth Amendment, the court must apply an "objective reasonableness" standard.  *See Graham v. Connor*, 490 U.S. 386, 388 (1989).  Under this standard, "the question is whether the officers' actions are `objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (citations omitted).  The test is "reasonableness at the moment" of the use of force, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396 (citations omitted); *see also Fox v. DeSoto,* 489 F.3d 227, 236 (6th Cir. 2007). That analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (quotation marks and citations omitted).  The Sixth Circuit has stated it this way:

> The individual's interest in not having the particular force used against them is weighed against the officers' 'interest in performing these actions, as gauged by `the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 687 (6th Cir.2006) (quoting Graham,

490 U.S. at 396, 109 S.Ct. 1865). Though these factors are important, they are not exhaustive, as the court must ultimately determine "`whether the totality of the circumstances justifies a particular sort of seizure.'"

*Griffith v. Coburn*, 473 F.3d 650, 656 (6th Cir. 2007).  As noted by a very recent Sixth Circuit opinion on this very topic:  "Thought important, these factors are not the end of the matter, as the court ultimately must determine "'whether the totality of the circumstances justifies and particular sort of seizure.'"  *Martin v. City of Broadview Heights, et al.*, __F.3d __  (6th Cir. CA No. 11-4039, April 9, 2013)(Recommended for Full Text Publication)[1](attached for the Court's ease of reference), citing and *quoting St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005), and *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).

In a case very similar to the case at bar, the Sixth Circuit in *Martin v. City of Broadview Heights, et al.*, considered the *Graham v. Connor* factors, as interpreted by the Sixth Circuit in *Griffith v. Coburn, supra*.  First the *Martin* court examined "[t]he individual's interest in not having the particular force used against them as weighed against the officers' 'interest in performing these actions, as gauged by `the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, . . .'"

In *Martin*, the decedent was not mentally disabled or autistic, but apparently intoxicated on LSD.  Notwithstanding this particular factual divergence from Roland's case, the Sixth Circuit made observations which are particularly apposite here:

In examining the second Graham factor--which focuses on the officers' conduct in light of any 'immediate threat' Martin posed to their safety and that of others -- we 'must take in to account' that the officers 'had reason to believe that [Martin] was either on drugs or mentally unstable and they knew he was unarmed."  (Internal citations omitted).  **Martin was completely naked** when he approached [Officer] Tieber.  **If Tieber was not sure that Martin was unarmed as he drew near, this became apparent when Martin turned away**

---

[1] Opinion and Judgment filed affirming the District Court on 04/09/13.  Mandate issued 05/01/13.  *See* attached Opinion and General Docket.

>	**from Tieber and put his hands behind his back to allow Tieber to handcuff him.**  From the first, Martin exhibited clear signs that **he**

>	**was distraught: he was unclothed, acting erratically**, making incoherent statements, . . . .

*Martin, supra,* at 8 - 9.

In Roland's case, upon arrival, Defendant Officer Wallace noted that a facility employee, Hatter, appeared to have been involved in an altercation.  Hatter failed to provide Officer Wallace with any background information about Roland's disability or the extent and duration of the altercation between the Adult Daycare staff and Roland; nor did Officer Wallace make any inquiries relative to same.  Instead, Wallace and Hatter proceeded through the home, which was in obvious disarray, to Roland's room, where he, Officer Wallace, observed **Roland naked, standing against the back wall, bleeding from his hands, and staring into space, but in an apparent state of calm.**  Still being uninformed as to the extent of Roland's mental disability, Defendant Wallace attempted to engage Roland in a narrative.  **Wallace described Roland's as non-responsive, sweating heavily, "staring into space," and not recognizing that [he/Wallace] was there.**

>	. . . [T]he estate's police-practices expert . . . concluded that a reasonable officer in this situation--faced with an unarmed and distraught individual like Martin--would try to de-escalate the situation and reduce the level of force needed to gain control.

*Martin, supra,* at 8.  Similarly, the Plaintiffs' police-practices expert made clear that this is exactly what the defendant officers should have done in this situation.  Even though the January 22, 2000, lesson plan, "Sudden Custody Death Syndrome" failed to conform to generally accepted lesson plan criteria, it did contain one or more PowerPoint slides that discussed a person in Mr. Campbell's state as being in a "medical emergency" and to "avoid confrontation if at all possible."  Peters Report, *supra,* Exhibit B-2 at 9 (R. 1474).

10

The Court then found in Martin that instead of de-escalating the situation,

> [Officer] Tieber and his colleagues used severe force that did not
> match the threat Martin presented.  Tieber laid on Martin, belly to
> back, [Officer] Semanco struck his face, back, and ribs at least five
> times.  Tieber wrapped his legs around Martin's upper thighs, hips,
> and pelvis, and gripped Martin's chin or neck with his right arm.
> Zimmerman kneeled on Martin's calves, helped cuff him, and used
> force to keep him down.  Even after Martin was handcuffed and
> subdued, Zimmerman and Tieber used their arms to keep Martin in a
> face-down position, and did not roll Martin onto his side until he
> made 'gurgling' noise.  In sum, the officers' response to the threat
> Martin posed to them or others was unreasonable.

*Martin, supra,* at 9 - 10.

Here, instead of following the LUFCG as PowerPoint presentation as treating Roland's case as a "medical emergency" "avoid[ing] confrontation if at all possible."  (Peters Report, *supra,* Exhibit B-2 at 9 (R. 1474)), the Defendant officers approached and cuffed Roland behind his back, and using soft-hand restraints, attempted to ambulate him across the room. Defendant officers in conjunction with Defendant Hatter attempted to cover Roland with a blanket, at which point he became restive and agitated.  The officers used hand restraints to keep Roland in a seated position, in response to which Roland rolled to his side, then prone. At that point a struggle ensued involving Officers Wallace, Smith and the ADC employee Hatter. Defendant Officer Smith restrained Roland's feet.  Defendant Officer Wallace was restraining Roland's upper body.  Defendant Hatter was bear-hugging and/or otherwise positioned across Roland's lower back.  The blanket was further used to restrain Roland. Officer Wallace and Smith specifically noted Roland's heavy breathing, but did nothing to reposition him to accommodate a clear airway.  Officers Wallace and Smith completely ignored the prohibition against struggling with Roland in a prone position which compromised his breathing until the

11

point of death.  This Court must find, as did Judges Daughtrey and Stranch in *Martin*, that "the officers' response to the threat [Roland] posed to them or others was unreasonable."  *Martin, supra,* at 9.

Next, the *Martin* panel weighed the third *Graham* factor of the Officers' conduct against Martin's "attempts to evade or resist arrest."  *Martin, supra,* at 9.  The Judges reasoned that Martin's "attempts to evade the officers could have been construed when Martin "first. . . broke away from Tieber after initially surrendering and jogg[ing] about 20 feet before Tieber took him down to the ground."  *Id.*  There is nothing to akin to this type of "evading" in Roland's case.  Roland much like Martin, allowed the cuffing in the first instance.  All that can be said is that Roland started to respond with usual autistic tendencies of moving away from the touch of the blanket, buckling to the floor, and rocking on the floor.

Then, the Court must examine the testimony of the officers in light of the "second stage" of Martin's alleged resistance as "he lay uncuffed on the ground with first one, then two, and finally three officers on top of him."  *Martin, supra,* at 10.  The officers in Martin argued that "the district court failed to consider that Martin actively struggled while they tried to restrain him."  The Judges disagreed.  *Id.*  The Court found that

> [the] evidence fairly leads to an inference that Martin's physical movements were an attempt to gasp for air and escape the compressive weight of the officers on top of him, not an effort to fight with the officers or get away.

*Martin, supra,* at 10.

The same inference can certainly be drawn here.  Officer Wallace was positioned next to Roland's face and head, restraining Roland from that angle -- his right arm restraining Roland's right arm and his left arm restraining Roland's left elbow.  Smith was restraining Roland's legs and feet. The ADC employee Hatter was restraining Roland from behind, over his buttocks and upper body.  Roland was only 5 feet 5 ½ inches, with three men with much greater

height and girth restraining him.  Wallace describes Roland as pushing up three or four inches off of the floor.  That was the last response and the last time Wallace saw Roland's eyes.

The officers do not even describe Roland's conduct as resisting. To the extent that one might argue that Roland was purposefully resisting custody, any such assertion is easily put to rest by the comparison of these facts with those facing the Sixth Circuit in *Martin*.

> [M]erely because Martin offered some resistance before he was handcuffed [or in Roland's situation, when he was handcuffed], [the Sixth Circuit] precedents foreclose this line of argument.  The Fourth Amendment's protections do not evaporate the moment an individual resists an officer's command.

*Martin, supra,* at 10 (citations omitted).   The Judges found that "[i]n short, the force the officers used was not reasonably calculated to neutralize Martin's resistance."  *Id*.  Neither was the force in Roland's case.  *See also, e.g., Pigram ex rel. Pigram v. Chaudoin,* 199 Fed.Appx. 509 (6th Cir. 2006) (proper test for excessive force is not the mere size or impact, but whether the force was necessary to make an arrest); *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 904 (6th Cir. 2004) ("(t)he diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.").

The final step of the *Martin* Court's analysis was "whether the totality of the circumstances justifie[d] a particular sort of . . . seizure."  *Id.*, *quoting Tennessee v. Garner*, 471 U.S. 1, 8 – 9 (1985).  Here the Court determined that "[b]eyond the situation facts . . .[the Court's precedents require [the judges] to evaluate the officers' use of certain tactics 'in light of the testimony regarding the training that [the officers] received . . . .'"  *Martin*, *supra*, *quoting Griffith v. Coburn*, 473 F.3d 650, 657 ( 6th Cir. 2007).

In Roland's death, just as in the *Martin* case, the officers testify in some detail about their training in excited delirium. They were clearly aware of the risk of in-custody deaths resulting

from excited delirium.   Both Wallace and Smith testified that Roland exhibited classic behaviors of someone in a state of excited delirium, included making grunting/guttural sounds; bizarre, violent and/or aggressive behavior; violence toward objects; public disrobing; superhuman strength; overheated/excessive sweat; and, irrational physical behavior.

Despite the fact that Roland exhibited additional tell-tale, textbook symptoms of excited delirium, including extreme agitation, disorientation, and being psychotic in appearance, Defendant officers and Defendant Hatter continued to struggle with Roland until he expired.

Finally, Judges Daughtrey and Stranch concluded in *Martin* that:

> [t]he tactics [the officers used] were not justified by Martin's possible crime, the threat he posed to anyone's safety, or his resistance.  The officers' failure to adhere to a departmental police that explained the grave dangers of positional asphyxia verifies the unreasonableness of their actions.   The quantum of force the officers used was constitutionally excessive, violating the Fourth Amendment right of an unarmed, minimally threatening, and mentally unstable individual to be free from gratuitous violence during an arrest.

*Martin, supra,* at 10.

Comparing Roland's situation to the facts of *Martin* and the Court's conclusions in that case, it is important to note that here Wallace and Smith did not even consider their restraint of Roland an arrest, mitigating in favor on *no* force.  Per Officer Wallace, this was an emergency detention.   Yet, the defendant officers' failure to adhere to a departmental policy [albeit flawed, as described by Plaintiff's police practices expert, Dr. Peters], identifying Roland, without question, in a state of excited delirium -- and which policy explained the grave dangers of sudden in-custody death when such elements of excited delirium were present -- "verifies the unreasonableness of [Officers Wallace and Smith's] actions." *See Martin* at 11.

The Court found in Martin that "the quantum of force the officers used was constitutionally excessive, violating the Fourth Amendment right of an unarmed, minimally

threatening, and mentally unstable individual to be free from gratuitous violence during an arrest." *Id.* So it is in the case of Roland Campbell. Three people, one of them not an officer, restrained Roland out of all proportion to the threat he posed, and in the face of evidence that he was suffering from a medical emergency. Roland, without question, was an individual with serious diminished capacity. He was unarmed at the time of his detention, and in an obvious state of excited delirium. He should never have been subjected to prone restraint.  At the time of his death all of this was clearly established by the law and the Lexington Fayette Urban County Government policies, procedures and training modules. The case law of the Supreme Court and this Circuit hold that with the precise facts provided by the Defendant officers, without question their actions constituted excessive force in violation of Roland's Fourth Amendment rights.

All of the facts in this case, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the non-moving party, cannot overcome a summary judgment for Plaintiffs in this matter.  To prevail, the Lexington Fayette Urban County Government "must show sufficient evidence to create a genuine issue of material fact." *Klepper v. First Am. Bank,* 916 F.2d 337, 341-42 (6th Cir. 1990).   A mere scintilla of evidence is insufficient, as "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).   Under no construct of these facts in this case could a jury find for LFUCG.   Summary judgment for the plaintiff is proper as a matter of law.

**B.      The Defendant Officers Are Not Entitled to Qualified Immunity.**

The facts and law were clearly establish that the force used to restrain Roland was excessive. The contours of that law had been clearly established at the time the officers applied that force. The officers are not entitled to the defense of qualified immunity herein.

In *Saucier v. Katz*, the United States Supreme Court established a two-pronged inquiry to determine an official's entitlement to qualified immunity in the context of an excessive force claim. *See* 533 U.S. 194, 200 (2001).  First, the court must determine whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Id*. at 201.  If so, the court must then determine "whether th[at] right was clearly established on a . . . specific level." *Id*. at 200.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202.

This question is likewise put to rest to the detriment of Officers Wallace and Smith.  As noted above, and as a matter of law, the officers violated Roland's constitutional right to be free from excess force under the Fourth Amendment.  Thus, the next step of the analysis is whether the "contours of the law" are "'sufficiently clear' to show that 'a reasonable official would understand that what he is doing violates that right." *Martin*, *quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The *Martin* Court defined "sufficiently clear" as  neither overly general nor a microscopic analysis: the goal is "to zoom in close enough to ensure the right is appropriately defined. . ." *Id*. at 11, *citing Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012).

The court concludec:  "The prohibition against placing weight on Martin's body after he was handcuffed was clearly established in the Sixth Circuit as of August 2007 [by] *Champion*, 380 F.3d  [893] (holding it is an objectively unreasonable use of force to apply back pressure on a prone suspect who no longer resists arrest and poses no flight risk).  *See also Griffith*, 473 F.3d, at 659.

16

Reviewing the Sixth Circuit precedent, the *Martin* court concluded:

> Our precedents and [the police agency's] own policies clearly established in August 2007 that the force the officers used to restrain Martin was excessive.  A reasonable officer should have know that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight . . . would violate that person's clearly established right to be free from excessive force.  The Constitution does not countenance this level of force.  The officers are not entitled to qualified immunity.

*Martin, supra,* at 15.

Here, the officers knew they were responding to a call at a home for the disabled mentally challenged suspect at an adult day care facility.  When Wallace arrived, the group home was in complete disarray and Wallace found Roland naked, standing against the back wall, bleeding from his hands, and staring into space, in an apparent state of calm, but non-responsive, sweating heavily, "staring into space" with no apparent recognition that a police officer was standing there.

Instead of treating this as the medical emergency that it was (*see, e.g.,* Peters report at 9, R. 1474), Officer Wallace, later aided by Smith, treated this as an "in custody" situation, attempting to handcuff a nonverbal, autistic boy (with other cognitive disabilities).  Clearly, exertion of that kind of force upon a relatively small, clearly disable young man who was already in physical distress (sweating, uncommunicative), was not an objectively reasonable choice at the scene. The "reasonable officer[s] should have know that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight . . . would violate that person's clearly established right to be free from excessive force."

As so aptly said by the *Martin* judges:  "The Constitution does not countenance this level of force.  The officers are not entitled to qualified immunity."

II.  **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF WHETHER, IN INVITING AND/OR ALLOWING THE ADC LEXINGTON "CAREGIVER" HATTER TO ASSIST ROLAND'S RESTRAINT, THEY ARE LIABLE FOR CREATING A STATE-CREATED DANGER.**

Defendant Officers Wallace and Smith are legally responsible for having placed Roland in an enhanced position of danger by inviting and/or allowing ADC employee Hatter to participate in his restraint -- also known as a "state created danger" -- which was the proximate cause of Roland Campbell's death, in whole or in part. (Doc. 1, Complaint Paragraphs 149-155).

Admittedly, the "Due Process Clause does not impose an affirmative duty upon the state to act to protect its citizens." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189 (1989). The exception to this general rule for a "state created danger" is where a state actor places an individual in a position of danger. *Brooks v. City of Philadelphia*, 747 F.Supp2nd 477,484 (E.D. Pa. 2010).

In order to show a constitutional violation pursuant to the state-created-danger doctrine, each of the following elements must be present: "(1) an affirmative act by the state [that] either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) that the state knew or should have known that its actions specifically endangered the plaintiff." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 763 (6th Cir. 2010) (*citing Jones v. Reynolds,* 438 F.3d 685, 690 (6th Cir. 2006)).

Looking at the first prong of the test -- "affirmative act by the state [that] either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party" -- this Circuit reasons that "[b]ecause it is often difficult to distinguish action from inaction, '[r]ather than focusing on metaphysical question of whether officer behavior amount to affirmative

18

conduct or not, we have focused on 'whether [the victim] was safer before the state action than he was after it.'"   *Barber v. Overton*, 496 F.3d 449, 465 (6th Cir. 2007) (Judge Cole; concurring in part and dissenting in part).   The answer to this question is simple.   Roland Campbell had become calm by Officer Wallace's own testimony by the time he, Wallace, entered the home and saw Roland squatted in his room.    Had Wallace walked out at that moment and called for medical back up as Dr. Peter's opines Wallace should have been instructed to do, Roland Campbell would have survived this incident.   *See* Peters Depo., at 260.[2]   *See also*,   Peters report, Exh.1, at 12-13 (R. 1477-1478).

This is borne out by Dr. Nichols, who opined that the second episode of excited delirium, incited by the police, and attempted to be subdued by the police with the approved assistance of Hatter, ended Roland's life.   *See* Report of Dr. George M. Nichols, Commonwealth Medical Services, Inc., at 3 (Doc. 126-5, R.1565).

So, did this create a "special danger" for Roland?   Plaintiffs' respond in the affirmative that the Officers' conduct did in fact place Roland at a special risk, "as distinguished from a risk that affects the public at large."   *Barber v. Overton*, 496 F.3d, at 465, *quoting Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006).

How could one contend that the risk that Roland experienced was in any way akin to a risk that affect the public at large?   In the midst of an ill-conceived, in-custody restraint, the officers allowed, and even invited Hatter, a civilian who was even larger than themselves, to participate in attempting to control Roland—particularly when he had had no success in peaceably controlling Roland.

---

[2] "I think in this case they basically created their own situation by coming up and touching him and handcuffing, and then putting the blanket over him, which created his reaction to that, and then it was game on time.  but we didn't have any EMS around.  And so then, when it was game on time, they were so involved, they couldn't respond until it was over."

While they tried to explain away their acquiescence in Hatter's involvement by saying Hatter was a trusted caregiver, this is disingenuous if one considers that when they arrive Hatter was sweating and covered with blood from having participated in lengthy attempt to restrain Roland before then. Nor was Hatter acting passively in this situation, by calming as the officers contend. By all accounts, Hatter was straddling, crouched over, and putting pressure on Roland's torso and/or buttocks, in conjunction with the officers' restraints.

The next question is whether the state actor is culpable for the danger. The Sixth Circuit holds that Plaintiffs "must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteen Amendment." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). However, in the situations where a state actor has time to reflect and to deliberate before acting, "deliberate indifference is the standard," not "so egregious as to be arbitrary." *Barber v. Overton*, 496 F.3d, at 465, *citing County of Sacramento v. Lewis*, 523 U.S. 833 (1998); *McQueen v. Beecher Cmty. Sch.,* 433 F.3d 460 (6th Cir. 2006).

Here there can be no question that Officers Wallace and Smith had time to deliberate, but choose the wrong course of action in that deliberation. When Wallace arrived he observed Roland calm and crouched in the corner, albeit naked. He had time to exit the home, call and wait for back-up. It was only after the officers made the ill-fated decision to take Roland into custody -- as opposed to treating this as a medical emergency per Dr. Peters -- that the situation escalated. (Peters, Depo., at 260). In that escalation, the officers then made the second deliberately indifferent decision to engage the assistance of an untrained, ill-equipped maintenance man for the facility (who only sometimes acted as Roland's caregiver) to assist with the restraint.

20

These officers cannot claim that they were unaware of what was about to transpire. They testified at great length that they had training on recognizing the signs and symptoms of excited delirium and knew it could be fatal. Officers Wallace and Smith had "kn[own] of and disregard[ed] an excessive risk to the victim's health and safety." *Ewolski*, 287 F.3d 492, 513. The officers were subjectively "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw that inference." The officers cannot deny that they had this "subjective awareness" from the little training they had. They were aware of Roland's symptoms. They knew that excited delirium put a subject at high risk for sudden in custody death. Yet they proceeded with what amounted to prone restraint aided by an untrained worker who had not had any training, much less training similar to theirs on the specific topics, which further jeopardized Roland's life.

The result: these Defendant police officers placed Roland in a position in which he was unlikely to be able to breathe properly; allowed and/or invited a third party who was not an officer to participate in subduing Roland; and at one point the three put their combined weight of over six hundred pounds on a young man who was five foot five and a half.

The officers' conduct in engaging Roland prompted him into a second round of excited delirium, which they knew or should have known would cost him his life. They proceeded on this path with the assistance of an untrained person who expedited the end of Roland's life. The officers' subjective belief that Hatter's involvement was not restricting Roland's airway is of no moment when one considers that Hatter should not even have been allowed in close enough proximity for it to be an issue.

There is no question of fact that the Roland's death was caused in whole or in part by the Officers Wallace and Smith having caused a state-created-danger to exist. Plaintiffs have

21

demonstrated all of the elements of that constitutional claim.  Therefore summary judgment on that cause of action appropriate herein.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully move the Court to enter the Order granting them summary judgment on the issue of excessive force and on their claim for state created danger; and further move for a judgment as a matter of law denying the officers defense of qualified immunity.

Respectfully submitted,

_/s/ Christina Norris_____

CHRISTINA R. L. NORRIS
6013 Brownsboro Park Blvd.
Suite B.
Louisville, Kentucky  40207
(502) 899-4755
Email:  christina@norrislawky.com
*Co-Counsel for Plaintiffs*

and

/s/ David Ferleger_____

DAVID FERLEGER
Archways Professional Building
413 Johnson Street, Suite 203
Jenkintown, PA 19046
Telephone:  (215) 887-0123
Email: david@ferleger.com
*Co-Counsel for Pecola Campbell*
*and Starsky Cook, Individually*
*as Administrators for the Estate*
*of Roland Campbell*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing has been transmitted via CM/ECF to the following on this the 16th day of September, 2013:

Carolyn C. Zerga, Esq.
Lexington-Fayette Urban County Government
Department of Law
200 East Main Street
Lexington, Kentucky 40507
*Counsel for Defendants Bastin, Wallace and Smith*

  /s/ Christina Norris_____
CHRISTINA R. L. NORRIS