UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

|  |  |  |
|---|---|---|
| PECOLA CAMPBELL AND STARSKY COOK Individually and as Administrators of THE ESTATE OF ROLAND CAMPBELL | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| V. | ) ) | Civil No.: 11-155-GFVT |
| RONNIE J. BASTIN, Individually and as Police Chief for Lexington-Fayette Urban County Government; OFFICER DERRICK P. WALLACE; and OFFICER MATTHEW R. SMITH, Officers of Lexington-Fayette Urban County Government Division of Police | ) ) ) ) ) ) ) ) ) | **MEMORANDUM OPINION & ORDER** |
| Defendants. | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

When the care givers of Adult Daycare of Lexington were unable to sufficiently calm Roland Campbell, an autistic and cognitively disabled resident of the facility, they requested assistance from the Lexington-Fayette Urban County Government Division of Police. Pecola Campbell and Starsky Cook, as administrators of Roland Campbell's Estate, allege that when Officers Derrick P. Wallace and Matthew R. Smith arrived, they engaged in activities that ultimately contributed to Campbell's death. Specifically, Campbell's Estate asserts claims under 42 U.S.C. § 1983 against these officers and Ronnie Bastin, individually and as Police Chief of the Lexington-Fayette Urban County Government, for the use of excessive force, failure to train, and state created danger. The Police Defendants have countered with a Motion for Summary Judgment, wherein they raise the shield of qualified immunity and argue that the Court may

dispose these claims as a matter of law.  Campbell's Estate has opposed that motion and filed a Motion for Partial Summary Judgment of its own, arguing that it is entitled to judgment as a matter of law on most of its claims.  Because the Court finds that qualified immunity protects the Police Defendants from suit under these circumstances, their Motion for Summary Judgment shall be **GRANTED**, and Campbell's Estate's Motion for Partial Summary Judgment shall be **DENIED**.

I

At the time of the incident, Roland Campbell was a twenty-one year old man, who was autistic and severely mentally retarded.  Campbell had no expressive language, but was able to follow one-step directions.  According to a psychological evaluation conducted before this incident, Campbell had demonstrated, "a history of inappropriate and aggressive psychological behaviors," was "at risk for harm," and needed twenty-four hour supervision. [R. 1-1 at 10].  In September 2009, Campbell became a resident of Adult Daycare of Lexington, where he lived for nine months prior to his death.  According to the Complaint, soon after placement at Adult Daycare, Campbell was involved in several incidents wherein he demonstrated, "increased extreme agitation including property damage, self-injurious behavior and aggression toward others." [R. 1-1 at 18].  Specifically, the Complaint notes that, at certain times while at Adult Daycare, Campbell urinated in a bedroom, defecated in the closet during the night, refused to keep his clothes on, "ran around uncontrollably, knocking everything over, and refused to cooperate in any manner with the staff," climbed on top of furniture, destroyed decorations, engaged in "stripping and streaking," pulled down a dresser, flipped over a television, and caused "severe property damage." [R. 1-1 at 18-21].

2

From time to time, Adult Daycare crisis manager Eric Hatter was called to assist the on-duty staff in resolving difficult situations involving Campbell. [R. 128-1 at 3]. Hatter testified that he had been successful in calming Campbell during a number of previous occasions. [R. 128-2, at 3-7]. One such situation occurred on April 17, 2010, the day before the incident, when Campbell experienced a particularly severe incident of "uncontrollable behavior." [R. 1-1 at 22]. Upon his arrival to the Adult Daycare facility, Hatter found Campbell jumping up and down, and noticed that a television had been flipped over, items were broken on the kitchen floor, and Campbell's bedroom was "in shambles." [R. 128-2 at 10]. Hatter spoke to Campbell and administered his medication, after which Campbell calmed down. [R. 128-2 at 11].

As admitted by Campbell's Estate, "the parties are in no real dispute as to the facts of what occurred on the day Roland Campbell died." [R. 143 at 1]. On April 18, 2010, at around 1:00 p.m., Campbell again became agitated and engaged in similar conduct to the night before. According to John Dickey, the only Adult Daycare employee at the facility at the time, Campbell:

> refused to put on any clothing, broke items in the kitchen and tilted over the refrigerator; turned over the dresser in another resident's bedroom; turned over the living room television; ripped the toilet out of the floor; removed all of his clothing from the dresser in his bedroom and started to destroy his bed and dresser by picking them up and slamming them down. Further, Campbell, who was naked, climbed out of his bedroom window.

[R 128-1 at 3] (referencing Dickey's deposition at R. 128-3). Though Dickey was able to return Campbell to the facility, he was unable to sufficiently calm Campbell and called Hatter for assistance. According to Dickey, he was concerned not only for Campbell's safety, but the safety of the other two residents of the facility. [R. 128-3 at 3].

Hatter arrived at Adult Daycare at 2:30 p.m., and he found the facility in disarray. He

reports that the refrigerator had been flipped, the television had been turned over, the toilet had been pulled from the floor, the shower head had been torn down, and a light fixture had broken down. [R. 128-2 at 14, 16]. Hatter found Campbell naked in his bedroom engaging in the further destruction of that room, including pulling down the blinds and throwing his clothes onto the floor. [R. 128-2 at 16]. According to Hatter, when Campbell saw him, he approached him and grabbed his shirt, such that Hatter had to pull away. [R. 128-2 at 17]. At that point Campbell began jumping up and down. In an attempt to calm him, Hatter offered Campbell his blue blanket, which Hatter identifies as an object that Campbell loved and that had comforted him in the past. [R. 128-2 at 18]. Hatter recalls that Campbell would lay on the floor with this blanket and cover his head with it, presumably when he became agitated. [*Id.*] However, on this occasion, Campbell did not accept and was not calmed by this object. Campbell again grabbed Hatter's shirt, this time tearing it in the process. [*Id.*]

Hatter continued interventions to attempt to calm Campbell. He placed Campbell in a standing cradle, in which he stood behind him and held his wrists to his waist. [R. 128-2 at 19]. When he attempted to maneuver Campbell into a seated kneeling cradle assist, Campbell went forward to his stomach, and Hatter let him go. [R. 128-2 at 19-20]. Next, Hatter administered the medication that had calmed Campbell the night before, but on this day he remained agitated. [R. 128-2 at 21]. Campbell began pulling at the socket on the wall of his bedroom, tearing down the blinds, jumping up and down, and hitting the light fixture. [R. 128-2 at 22-23]. Hatter asked the facility to cut the power to the house for Campbell's protection, which it did. Campbell proceeded to break the light fixture, the wall socket, and cut his hand. Hatter states that he watched Campbell to try to make sure he did not hurt himself further, but he realized that he was

4

not going to be able to control Campbell on this occasion and asked a staff member to call

Campbell's case manager and 911. [R. 128-2 at 24-25]. At that point, Hatter removed himself to

the doorway to watch Campbell until the police arrived. During this time, Campbell continued to

be agitated, to put his hands on the wall, and pull at the wall socket, which was now fully torn off

with exposed wires.

Officer Derrick Wallace was dispatched to Adult Daycare shortly after 3:30 p.m., and he

was the first to respond to the scene. [R. 128-4 at 3-4]. He had been alerted that this incident

involved a person with mental disabilities who was out of control. [R. 128-6 at 4]. When he

arrived, he found Hatter on the front porch waiving frantically and looking visibly upset. [*Id*.]

He noticed that Hatter's shirt was torn with blood on it. [*Id*.] By the accounts of both men,

Hatter apprised Officer Wallace that Campbell was out of control and recommended that he be

transported to Eastern State Hospital, a mental health facility. [*Id*.] All parties acknowledge that

Hatter did not elaborate, nor did Officer Wallace ever fully learn, the specifics of Campbell's

disability or the duration of the incident before his arrival. [R. 128-1 at 5].

Accompanied by Hatter, Officer Wallace entered the house to find one of the other

residents siting in the living room area. [R. 128-6 at 4]. When Officer Wallace entered

Campbell's room, he described his first impression as follows:

> The first things I noticed was he was completely nude. He was covered in sweat. He
> appeared to be bleeding from his hands. And looking around the room, the room was
> in complete disarray. I remember the walls to have blood on them. It appeared to be,
> like, finger marks down the walls…and while I was observing Mr. Campbell, he was
> – and the – there was an electrical socket on the back wall. The cover was off. He
> was digging in the electrical socket.

[R. 128-6 at 5]. The Police Defendants have attached photographs of the scene that confirm

Officer Wallace's description. In the photographs, Campbell's bed is overturned and broken in pieces. [R. 128-19 at 2; R. 128-20 at 1-2]. His clothes are scattered over the floor, and his dresser and night stand are turned over. [R. 128-20 at 1-2; R. 128-21 at 1]. Most notably, the walls are streaked with bloody hand prints and the carpet stained with blood. [R. 128-19 at 1]. Officer Wallace attempted to "start a dialogue" with Campbell, but Campbell neither responded nor acknowledged his presence. [R. 128-6 at 5-6]. Instead, Campbell continued to fidget with the wall socket. [R. 128-6 at 6].

Officer Wallace states that when he found him, Campbell "wasn't in any danger to himself nor anybody else at the time," however, he was not calm and still "appeared irritated." [R. 128-6 at 6, 8-10]. Officer Wallace also noted that he "didn't want to go and approach him not knowing what would happen until another officer arrived." [R. 128-6 at 6]. From his observation of the destruction of the room as well as Hatter's clothing and demeanor, Officer Wallace believed that Campbell had been and could become a danger to himself or others. [R. 126-8 at 10]. So Officer Wallace radioed another unit to come and assist him, and he requested that it hurry. [R. 128-6 at 16-17]. Officer Matthew Smith responded, and when he arrived, Officer Wallace briefed him on the situation, telling him that Campbell should be detained and taken to Eastern State Hospital for mental health treatment. [R. 128-6 at 18].

At that point, Officers Wallace and Smith approached Campbell. [R. 128-6 at 18]. Hatter asked whether they wanted him to accompany them, and the Officers indicated that his presence could be helpful. [R. 134-9 at 7; R. 134-7 at 5]. As the men approached Campbell, Officer Wallace talked to him calmly to reassure him. [R. 128-6 at 18]. Hatter and the officers asked Campbell to stand up and put his hands behind his back, which Campbell did without

incident.  [R. 134-9 at 7; R. 134-7 at 5].  With some limited assistance from Hatter, Officer

Wallace took Campbell by the left wrist and Officer Smith took his right wrist and handcuffed

Campbell, making sure the handcuffs were loose enough to be comfortable.  [R. 128-6 at 19; R.

134-7 at 5; 134-9 at 7].  Because Officer Wallace did not want to get blood on the police car, he

called a transport unit there to assist him. [R. 128-6 at 19].  While they were waiting, Officer

Wallace requested something to cover Campbell with since they would be leading him into a

residential neighborhood and he was still naked.  [*Id*.]  Hatter provided the officers with

Campbell's blue blanket, which was draped over Campbell's shoulders "like a Superman cape."

[*Id*.]

Campbell started to "dance around a little bit," so the officers decided to sit him down on

the floor.  [R. 128-6 at 20].[1]  Officer Smith states that during this time he intended to interview

Hatter more about Campbell's condition, but this conversation never occurred.  [R. 128-5 at 23].

 Campbell, handcuffed and seated between two officers near the door of his bedroom, became

more irritated and tried to get up.  [R. 128-6 at 20-21].  On two to three occasions Officer

Wallace applied pressure on his shoulder to keep him seated, but ultimately Campbell rolled over

on his right side with his legs extended and began to struggle.  [R. 126-6 at 21].  From there,

Officer Wallace recalls that, "it escalated quickly."  [R. 128-6 at 22].  Campbell began to thrash

and kick, grunting and trying to get his hands free from the hand cuffs.  [R. 128-6 at 23].

Ultimately, he rolled over onto his chest into the prone position and began scooting toward the

doorway of his bedroom that led into the hallway. [R. 128-6 at 24; R. 134-9 at 8].

What the officers and Hatter did at this point is critical to this case, and so the Court shall

describe their positions and actions in detail. Officer Wallace kneeled to Campbell's left side. [R. 128-6 at 25; R. 128-5 at 24]. He took hold of Campbell's left elbow with his left hand and held Campbell's right arm with his right hand through the blanket. [R. 128-6 at 25]. While in this position, Officer Wallace put his face close to Campbell's and attempted to reassure him by saying, "Buddy, just calm down. It's going to be all right." [R. 128-6 at 27; R. 128-5 at 24]. Officer Smith positioned himself near Campbell's legs in an attempt to prevent Campbell from kicking. [R. 128-6 at 25; R. 128-5 at 23-24]. At some point Officer Smith employed the blanket that had previously been draped around Campbell's shoulders as a webbing to help him accomplish this purpose. [R. 128-5 at 27, 34]. Officers Smith and Wallace maintain that the blanket was at no time swaddling Campbell. [R. 128-5 at 36-38]. Hatter's position is not entirely clear from the testimony. Hatter says that he was initially on his knees holding Campbell around the waist, but he eventually let go, putting his arms on either side of the doorway to protect Campbell from striking it. [R. 128-2 at 39; R. 134-9 at 9-10]. He indicates that he was not putting any weight on Campbell. [R. 134-9 at 10]. Officer Smith recalls that Hatter kneeled near Campbell's buttocks region, wrapped his arms around Campbell's waist, and talked to him in an attempt to calm him. [R. 128-5 at 24]. Officer Wallace claims he did not have a good view, but thought that, while Hatter was not completely on top of Campbell, he was on Campbell's buttocks or legs. [R. 128-6 at 27]. Either way, none of the individuals involved indicate that anyone was ever on top of or putting any weight on Campbell's back to hold him down, an observation confirmed by John Dickey, an Adult Daycare employee who was not involved in the

---

1 Hatter recalls that Campbell began to struggle while on his feet and fell to the ground. [R. 134-9 at 8]. Despite this difference, there is no testimony that the officers placed Campbell in the prone position.

restraint but had at least a partial view of the encounter.[2] [*See* R. 128-3 at 29-30; R. 128-5 at 24-27; R. 128-6 at 26-27, 32-33; R. 134-7 at 7; R. 134-9 at 9-10]. In their various positions, the men surrounding Campbell report different views as to what their goals were. Hatter testified that they were trying to get Campbell off the ground, while Officer Wallace indicated that he was trying to keep Campbell from escaping. [R. 128-6 at 26]. However, the general consensus of the officers and Hatter was that they were endeavoring to keep Campbell from further hurting himself.[3] [R. 128-5 at 29; R. 128-2 at 37-39; R. 134-9 at 9; R. 128-2 at 40].

Eventually, Campbell was able to free himself from one handcuff, pull all three men out in the hallway, and then, in what Officer Wallace describes as a feat a superhuman strength, lift himself and all three men three to four inches into the air. [R. 128-6 at 28]. Campbell then collapsed, closed his eyes, and became nonresponsive. [R. 128-6 at 28-29]. After checking for a pulse and finding no signs of life, the Officers moved Campbell into the living room where they, assisted by Hatter and another officer who had just arrived, administered CPR. [R. 128-6 at 31]. EMS arrived around 4:00 p.m., and found Campbell in the living room with dilated pupils and without a pulse. [R. 134-3 at 6]. The EC unit transported Campbell to a hospital where he was pronounced dead about 4:30 p.m. [*Id.*]. The autopsy lists the cause of death as acute cardiorespiratory failure, acute hypoxia, dehydration, physical exhaustion, acute symphathomimetic intoxication; and autism-induced excited delirium during prone restraint. [R. 1-1 at 27].

Pecola Campbell and Starsky Cook, the administrators of Campbell's Estate, initiated the

---

2 John Dickey testified that he did not see anyone laying or putting any weight on Campbell's back, check, or neck in any way that would be obstructing Campbell's airway. [R. 128-3 at 29-30].
3 Officer Smith recalled that there was some glass on the floor from which he was trying to protect Campbell. [R.

present action against Adult Daycare and the Police Defendants.  [R. 1-1].  Though Campbell's Estate has reached a settlement with Adult Daycare, its claims against the Police Defendants for use of excessive force, state created danger, and failure to train, remain.  The Police Defendants have filed a motion for summary judgment on the grounds that they are shielded from suit by qualified immunity, and even if not, there is no genuine dispute of material fact that they did not violate any of Roland Campbell's constitutional rights.  [R. 128].  Campbell's Estate not only opposes this motion, but has filed a summary judgment motion of its own.  Both motions are now ripe for resolution. [R. 134].

## II

### A

Under Rule 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56.  A fact's materiality is determined by the substantive law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The burden is initially on the moving party to inform "the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,'

128-5 at 29].  Hatter indicates that he was protecting Campbell from the door frame. [R. 134-9 at 9].

which it believes demonstrates the absence of a genuine issue of a material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may make this showing by demonstrating the absence of evidence to support one of the essential elements of the nonmoving party's claim. *Id.* at 322-25. Once this burden is met, the nonmoving party, "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56. Further, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479-80 (6th Cir. 1989). Instead, "the non-moving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## B

### 1

Campbell's Estate first claims that the Police Defendants used excessive force in both effectuating the initial detention of Campbell and subsequently holding him down on the ground in the prone position. The Police Defendants defend against Smith's claim by arguing that even under the set of facts most favorable to the Estate, the actions taken on both fronts were objectively reasonable and, therefore, qualified immunity shields them from liability.

When invoked, "the doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In evaluating claims of qualified immunity, courts generally apply a two-step analysis. First, "[t]aken in a light most favorable to the party asserting the injury, do the

facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court asks whether the right at issue was "clearly established." *Id.* "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). The right does not have to be defined so precisely that the exact action the officer engaged in has been held unlawful, but it must be "apparent" to the officer that pre-existing law forbad his conduct. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted). Although at one time courts were required to follow these steps sequentially, the Supreme Court has abandoned that position and now permits courts to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. Finally, once the defendants have raised the defense, "the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schs.,* 388 F.3d 967, 970 (6th Cir.2004)).

Excessive force claims against free persons that occur during arrest or seizure are analyzed under the Fourth Amendment's reasonableness standard. *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008) (citing *Graham v. Conner*, 490 U.S. 386, 395 (1989)). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The facts and circumstances of each particular case deserve careful attention,

including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "Though important, these factors are not the end of the matter, as the court ultimately must determine 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *St. John v. Hickey,* 411 F.3d 762, 768 (6th Cir.2005)). Finally, whether the force used is reasonable is an objective question "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 397-98. Courts do this to allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers'....violates the Fourth Amendment." *Id.* at 396 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (internal citations omitted)).

The Court shall first consider whether a constitutional violation of the Fourth Amendment has occurred by determining whether handcuffing Campbell and then restraining him while he was on the floor in the prone position was objectively reasonable under the circumstances. If so, the Police Defendants are shielded from liability by qualified immunity.

Campbell's Estate argues that the actions of the Police Defendants were not reasonably calculated to match the government interest at hand because none of the *Graham* factors counseled the level of force employed. Specifically, the Estate argues that under the first factor – the severity of the crime committed – Campbell committed no crime at all. Concerning whether Campbell posed an immediate threat to the safety of the officers or others, the Estate references

Officer Wallace's own quote that when he arrived on the scene, Campbell "wasn't in any danger to himself nor anybody else at the time." [R. 143 at 3 (citing R. 128-6 at 6)]. Moreover, Campbell's Estate argues that the actions of the Police Defendants actually escalated the circumstances, and it was not until after Campbell was cuffed, covered with a blanket, and sat on the floor that the situation turned problematic. Campbell's Estate concludes that the third factor – whether Campbell was actively resisting arrest or attempting to evade arrest by flight – also weighs against immunity because Campbell only struggled to escape the excessive force that was employed by the officers, not to evade arrest.

And while, on the surface, these arguments might be compelling, they are not dispositive here because they are divorced from the context of the situation and grounded in hindsight. The Sixth Circuit recently counseled that, "[i]f there is a per se rule in this area, it is that the 'totality of the circumstances' governs every case." *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 155 (6th Cir. 2013) (citing *Tennessee v. Garner,* 471 U.S. 1, 8-9 (1985)). Further, when considering the totality of the circumstances, reasonableness is judged from the perspective at a reasonable officer under the particular circumstances at issue. *Graham*, 490 U.S. at 397-98. As the Sixth Circuit has oft reminded district courts:

> we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996) (citing *Smith v. Freland,* 954 F.2d 343, 347 (6th Cir. 1992). When the actions of the Police Defendants are considered in context,

even in the light most favorable to the plaintiff, a much different picture emerges than the one painted by the conclusions of Campbell's Estate.

On the day of the incident, Officer Wallace was dispatched to Adult Daycare to address an issue involving a person with mental disabilities who was, "out of control." [R. 128-6 at 4]. When he arrived on the scene, Officer Wallace was met by Eric Hatter, an employee of Adult Daycare, whose shirt was torn and stained with blood. [R. 128-6 at 4]. Hatter was visibly upset and waiving frantically. [*Id*.] Once inside, Officer Wallace saw that at least one other resident was present at the facility. [*Id*.] Officer Wallace then entered Campbell's room, which was "in complete disarray." [R. 128-6 at 5]. The Police Defendants provide pictures of this room that show Officer Wallace's description to be no exaggeration. [R. 128-19, 20, 21]. In Campbell's room the furniture was overturned or in splinters, light fixtures and wall sockets were broken, wires were exposed, and clothes were strewn all about. [R. 128-6 at 5]. Moreover, the blood streaked the walls and stained the floor. [*Id*.] So, while it may be technically correct to note that Campbell had committed no crime, that tells little of the story. No crime may have been committed, but a great deal of damage had been done to cause a reasonable officer to perceive that the circumstances were severe.

Campbell's Estate makes much of the fact that when Officer Wallace arrived, Campbell was simply "crouched calmly in the corner of his room." [R. 143 at 19]. However, when Officer Wallace met Campbell, he was irritated, naked, sweaty, and either pulling at or chewing on wires that he had wrested from a wall outlet that he had broken. [R. 128-6 at 5; R. 134-9 at 5]. Further, the light fixture was broken, which had left shards glass on the floor and blood coming from Campbell's hand. [R. 128-6 at 5]. This presumably would have been the same blood that

was transferred to Hatter's shirt when it was torn during a prior altercation. [R. 128-6 at 4]. Under these circumstances, Officer Wallace's statement that when he originally arrived on the scene Campbell did not appear to be a threat to him or others, does not take away from the fact that there was substantial evidence to believe that Campbell had previously been a danger to himself and others, and could very likely become such a danger again without warning. This is supported by Officer Wallace's deposition, wherein he clarified his original statement that Campbell was not initially combative towards him with the qualification that "[i]t was obvious that [Campbell] was a danger to himself and possibly others given what I had seen while I was there just from the destruction of the room, and Mr. Hatter's, you know, clothing and his demeanor told me that he was obviously a danger to others as well." [R. 128-6 at 10]. Officer Wallace also testified that the circumstances of the scene caused him to believe that if someone did contact Campbell, that he "could possibly become combative or had the potential to become combative." [R. 134-6 at 3]. Under these circumstances it would have been reasonable for Officer Wallace to have concluded that Campbell posed a potentially immediate threat to himself and the other residents of the facility that justified the imposition of restraint in the form of handcuffs.

This conclusion is not disturbed by the testimony of the Estate's police policy expert, Dr. John Peters. Dr. Peters criticizes the Police Defendants for failing to properly conduct a thorough investigation to gain sufficient information about Campbell before taking action. [R. 134-8]. In Dr. Peters's view, the Police Defendants should have more completely interviewed Hatter about Campbell's disability and then followed the police policy by attempting to de-escalate the situation rather than confronting Campbell. [*Id.*] And while it may be true that Dr.

Peters's methods might have been better, the constitutional inquiry is not whether the Police Defendants' actions were a model of best practices, but whether they were objectively reasonable under the circumstances. *See Tallman v. Elizabethtown Police Dep't*, 167 F. App'x 459, 463 (6th Cir. 2006) (quoting *Dickerson v. McClellan,* 101 F.3d 1151, 1160 (6th Cir.1996) ("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 156 (6th Cir. 2013) (citing *Smith v. Freland,* 954 F.2d 343, 347 (6th Cir. 1992)) ("That deadly force from time to time violates standard police training does not by itself answer the liability question. In a § 1983 case, 'the issue is whether [the officers] violated the Constitution, not whether [they] should be disciplined by the local police force.'").  It is one thing to analyze this situation with the benefit of hindsight in the comfort of one's office, and another to do so standing amid a situation that, as previously discussed, bore the hallmarks of a volatile situation.

 Furthermore, even Dr. Peters agreed that sometimes handcuffing someone can, in fact, de-escalate the situation, and would certainly have limited Campbell's mobility to do additional damage.  [R. 134-8 at 5].  Dr. Peters also conceded that sometimes EMS will not come to transport a person until they are controlled.  [R. 134-8 at 5].  At the time of the incident, Officer Wallace believed that the most effective way to ensure that Campbell did not once again become a danger to himself or others was to handcuff him while they had the opportunity to do so.  This might not be the best practice, but it is an objectively reasonable one under the circumstances

      In a related argument, Campbell's Estate also claims that the situation was not volatile and required split second decision making, "[o]nly after the officers themselves created the emergency by taking Roland into custody."  [R. 143 at 15].  Not only does this statement ignore

the previously discussed context, but it runs counter to clear Sixth Circuit precedent, which has recognized that:

> [o]ther than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (*Carter v. Buscher,* 973 F.2d 1328, 1332-33 (7th Cir.1992)). Officer Wallace was called to Adult Daycare to help with a resident who had exceeded the facility's control. [R. 128-6 at 3-5]. Upon his arrival, he encountered a disheveled employee and a facility that was in disarray. [*Id.*] Campbell was naked, sweating, bleeding, and pulling at exposed wires from a wall outlet he had destroyed. [*Id.*] Under these circumstances, it was objectively reasonable for Officer Wallace to have detained Campbell in order to protect him, to protect others, and to facilitate transport to a hospital so that he could be treated.[4]

This is true even though Campbell placed his hands behind his back and allowed himself to be cuffed without incident. Even if Campbell was not actively resisting arrest or attempting to evade arrest by flight when he was handcuffed, the balance of the factors still weigh in favor of the reasonableness of the police conduct. To put it succinctly, under the circumstances, the Police Defendants had a strong interest in protecting both Campbell and everyone else at the Adult Daycare, and the force used to effectuate that interest, at least to the point of handcuffing Campbell, was slight and proportional to that interest. Thus, the initial act of handcuffing

---

[4] It is notable that the testimony suggests that the handcuffs were placed on Campbell in such a way that they would be loose enough to be conformable. That they were not overly tight is supported by the fact that he was ultimately

Campbell to place him in protective custody was reasonable and does not constitute excessive force.

The second challenged use of force must be considered in the full context of the facts that were previously discussed, with the chief difference being that Campbell is now in handcuffs. Campbell began to get restless while standing and waiting for the transport to arrive, and so the Police Defendants sat him on the ground.[5] He tried to get up on multiple occasions but Officer Wallace applied pressure to keep him seated. [R. 128-6 at 20]. Campbell then rolled over to his side and into prone position, from which he began to scoot toward the hallway. [R. 128-6 at 24; R. 134-9 at 8]. Officers Wallace and Smith, as well as Hatter, physically intervened to either keep Campbell from fleeing or to get him up from the floor. [R. 128-6 at 26]. Ultimately, Campbell did free himself of one handcuff and successfully drug the men toward the hallway, even lifting them some distance off of the ground before he collapsed. [R. 128-6 at 28]. This encounter ended with Campbell's death. [*Id*.]

The parties hang much of their arguments about the reasonableness of this second application of force on two Sixth Circuit cases, and so, although it somewhat conflates the steps of the analysis, the Court shall begin there. The first case discussed in detail by both parties is *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004). In *Champion*, the decedent was a 32 year old, nonverbal, and autistic man, who "overwhelmed the facilities of his caregiver, promoting a response by the Nashville police." *Id*. at 895. The officer, who was told of Champion's mental illness but not his inability to speak, used her pepper spray on Champion

_____

able to get free of them.

5 It is Hatter's recollection that Campbell started to resist while standing and, as a result, fell to the ground. [R. 134-9 at 8]. Either way, the important fact is that the Officers did not place him in the prone position.

after he did not respond to her questions and grabbed her shirt. When other officers arrived, they took him to the ground and placed him on his stomach. One officer placed him in a bear hug, while another officer handcuffed him and placed a hobble device on his legs to keep him from kicking. After vomiting three times, Champion ultimately died in this position.

Campbell's Estate argues that this case is "practically on all fours with Roland's situation," and from the few facts set forth above, that conclusion might seem correct. [R. 143 at 16]. However, the *Champion* court clearly stated that, "[t]he Plaintiffs have not suggested that the Officers acted improperly before Champion was handcuffed and hobbled." *Champion*, 380 F.3d at 897. Thus, the facts that are similar between the two cases were neither challenged nor found to be wrongful in *Champion*. After Champion was handcuffed, hobbled, and detained in the prone position, the officers continued to use pepper spray and put their weight directly on his back, making it difficult for Champion to breathe. Five witnesses confirmed that the officers continued to sit on or otherwise apply pressure on Champion's back while he was prone on the ground with his face toward the carpet. This was the use of force that was challenged in *Champion*. The court was clear that "the entire § 1983 claim is premised on the Officers' alleged use of pepper spray and the application of asphyxiating pressure after Champion's incapacitation." *Id.* Conversely, in Campbell's case there was no suggestion that pepper spray was involved. Further, according to the testimony of the four men who were on scene at the time of the incident, they neither applied pressure nor saw any of the others apply pressure to Campbell's back while he was in the prone position.

Campbell's Estate states that, "[b]ased on where [Officer Wallace] testified that his hands were throughout, the inescapable conclusion is that he was on top of Roland and that his weight

was also on Roland. Roland was only 5 feet, 5 ½ inches in height. Roland's body simply did not provide enough surface for the three men not to have covered Roland completely, given the positions they took." [R. 134 at 5]. However, this conclusion is not only very much "escapable," but it is in direct contradiction to the facts in the record. Unlike *Champion*, where five witnesses testified the officers put pressure on the decedent's back while he was in the prone position, the only four witnesses to this incident testified that no pressure was ever placed on Campbell's back or anywhere else that would have blocked his airway. [*See* R. 128-3 at 29-30; R. 128-5 at 24-27; R. 128-6 at 26-27, 32-33; R. 134-7 at 7; R. 134-9 at 9-10]. The positions of the men have been described in detail above, but in sum, Officer Wallace was kneeling to the left side of Campbell grasping his arms, and looking Campbell in the eyes to talk to him and reassure him. [R. 128-6 at 25; R. 128-5 at 24]. Officer Smith was at Campbell's feet attempting to manage the kicking of his legs. [R. 128-6 at 25; R. 128-5 at 23-24]. There is no testimony that either officer was on top of Campbell, and the descriptions, when taken together, do not necessitate such a conclusion. The testimony as to Hatter's location is somewhat varied between whether he was either kneeling or lying to the side of Campbell around his buttocks area with his arms wrapped around him or whether he was simply was hovering over Campbell with his arms acting as a protection from the door frame. [R. 134-9 at 9-10; R. 128-5 at 24]. The only testimony that Hatter was ever putting any weight on Campbell came from Officer Wallace, who stated that Hatter might have positioned himself on top of Campbell's legs or buttocks. [R. 128-6 at 27]. However, Wallace admitted that he did not have a perfect view of Hatter's exact position, and that he was certain he was not laying on or applying pressure to Campbell's back. [*Id*.] There is nothing inconsistent between the testimony that the men assumed these positions and the unanimous testimony that no

one was applying pressure to Campbell's back. The statement of Campbell's Estate is simply conjecture.

Reaching this conclusion does not require the Court to abandon its responsibility to construe all facts in the light most favorable to Campbell's Estate. The Estate itself acknowledged that "the parties are in no real dispute as to the facts of what occurred the day of Roland Campbell died." [R. 143 at 1]. The positions of the officers are the one main area in which the stories of the parties diverge. And, while the Court must, of course, construe the facts in the light most favorable to the Estate, on this point there is a complete absence of record facts to support the assertion that the positions of the officers and Hatter must correspond with the application of asphyxiating pressure to Campbell's back. In discussing the standard for qualified immunity in the context of a motion for summary judgment made under Rule 56(c), the Supreme Court has stated as follows:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Prince v. Elum*, 12-15526, 2013 WL 6230264 at *7 (E.D. Mich. Dec. 2, 2013) (citing *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citations omitted)); *See also Everson v. Leis*, 556 F.3d 484, 498 (6th Cir. 2009) ("Everson has provided no evidence to call into question Deputy Sheriff Wittich's account that Everson continued to pose a threat even after

he had been placed on the ground. Accordingly, Deputy Sheriff Wittich is immune from personnel liability on any excessive-force claim of Everson's."). Thus, even construing the facts in the light most favorable to the Estate, the conclusion that any of the men were on Campbell's back and applying asphyxiating pressure, is unsupported by this record.

Thus, while *Champion* does have some value to this case due to its insights that the mental condition of the decedent must be taken into consideration, it simply does not work to show that the actions of the Police Defendants and Hatter constituted excessive force. In fact, the case itself says as much:

> it also clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force. This appeal gives us no cause to consider whether leaving a bound suspect on his or her stomach without more constitutes excessive force that violates a suspect's clearly established Fourth Amendment rights. This is neither a "positional asphyxia" case nor a case in which the officers lightly touched or placed incidental pressure on Champion's back while he was face down. The asphyxia was caused by the combination of the Officers placing their weight upon Champion's body by lying across his back and simultaneously pepper spraying him.

*Id.* at 903. By express acknowledgment of the Sixth Circuit, the *Champion* case does not directly address circumstances such as these, and, therefore, does not conclusively show the actions of the Police Defendants to be unreasonable or a clearly established constitutional violation.

The second Sixth Circuit case focused on by the parties is even more clearly distinct from Campbell's case. In *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013), a naked and intoxicated 19 year old man, William Martin, approached police officers to arrest him, but jogged away when the officer took out his handcuffs to do so. The officer caught the Martin and fell on top of him. From there, the Sixth Circuit described the actions taken by the poilice

officers as follows:

> After [Officer] Tieber laid on Martin, belly to back, [Officer] Semanco dropped his knee into Martin's side, fell on top of him, and delivered one or two "compliance body shots" to Martin's frame. Tieber then punched Martin twice in the face, and Semanco struck his face, back, and ribs at least five times. Tieber wrapped his legs around Martin's upper thighs, hips, and pelvis, and gripped Martin's chin or neck with his right arm. [Officer] Zimmerman kneeled on Martin's calves, helped cuff him, and used force to keep him down. Even after Martin was handcuffed and subdued, Zimmerman and Tieber used their arms to keep Martin in a face-down position, and did not roll Martin onto his side until he made a "gurgling" noise. In sum, the officers' response to the threat Martin posed to them or others was unreasonable.

*Martin v. City of Broadview Heights*, 712 F.3d 951, 958-59 (6th Cir. 2013). Clearly, the circumstances of Campbell's case are different from those in *Martin*. The officers handcuffed and took Campbell to a seated position on the ground without incident, and it was Campbell who later thrust himself into the prone position. [R. 128-6 at 20; R. 134-9 at 8]. Further, not only is there is no testimony or evidence that the officers struck Campbell in any way, as previously discussed, the record shows they did not place pressure of any kind on Campbell's back. [*See* R. 128-3 at 29-30; R. 128-5 at 24-27; R. 128-6 at 26-27, 32-33; R. 134-7 at 7; R. 134-9 at 9-10]. Thus, the circumstances of *Martin* neither show the actions of the Police Defendants to be unreasonable, nor demonstrate that they were on notice that such actions would violate Campbell's constitutional rights.

The contrast between *Champion* and *Martin* with this case is useful in demonstrating that the force applied by the Police Defendants and Hatter was proportional to the interest of the government at stake and reasonable under the totality of the circumstances and the *Graham* factors. As has been discussed at length, Campbell had done substantial damage to the Adult Daycare facility, and in the process had injured himself. [R. 128-6 at 5; R. 128-1 at 3]. Whether

or not this is technically a crime, it was certainly a situation that was substantial enough to merit some use of force when bringing it under control. Though the situation was initially addressed by the application of handcuffs, it became more volatile when Campbell fell to his stomach. As has been made clear by Campbell's Estate, the prone position is not a safe place for Campbell to be under these circumstances, and so the Police Defendants would have had some motivation to intervene if only to reposition him. However, the difficulty of the situation was enhanced by Campbell's struggle and movement toward the hallway. While writhing on the ground, Campbell risked being cut again by broken glass, striking the door frame, or otherwise injuring himself. Further, Campbell was free from one of his handcuffs and if he returned to his feet unrestrained, he would once again become a potential threat to harm himself, other residents, the officers, and the facility itself.[6] Finally, while Campbell might not have fully comprehended the circumstances and also might have been making some attempt to escape the force of the officers, the struggle itself is a form of resistance provided by Campbell against the Police Defendants.

The Police Defendants met these circumstances with a reasonable and proportional amount of force. Officers Wallace and Smith avoided the conduct that made the actions of their counterparts in *Champion* and *Martin* unreasonable. That is to say, they did not use pepper spray or a taser to secure Campbell's compliance. They did not hit or strike Campbell in any way. Further, as has been discussed, the officers positioned themselves in such a way that they were not applying direct pressure to Campbell's back or blocking his airways. The uncontroverted testimony of all who were present at the time of the incident does not reveal a picture of aggressive police officers unnecessarily beating up a cognitively disabled child, but an attempt by

---

6 Notably, Officer Smith issued a warning to the others on the scene due to his fear that Campbell, who had now

the Police Defendants to bring Campbell under control and take him to receive treatment so that he would not pose a further threat to himself or others. Could the Court, writing from the comfortable confines of its judicial chambers have conceived of a more perfect method of proceeding? Perhaps. However, in those short moments, under difficult circumstances, the Police Defendants made difficult choice. These choices may not have been perfect, but they were objectively reasonable under the circumstances, which is all that is required to show that the Police Defendants did not commit a constitutional violation in the amount of force used in their interaction with Roland Campbell.

And while the Estate's failure to show a constitutional violation is sufficient to immunize the Police Defendants from suit, it is notable that even if the force used by the officers could be deemed constitutionally excessive, the officers could not possibly be considered as having been on notice that this was the case. Qualified immunity shields the Police Defendants so long as the constitutional violation was not "clearly established." *Saucier*, 533 U.S. at 201. The parties have brought to the Court's attention the two cases that most closely align with the factual circumstances of this case. However, as has been discussed in detail, the officers would have been unable to divine from those cases, or any other case the Court has uncovered, that their restraint of Campbell constituted a clearly established violation of the Fourth Amendment. *Anderson*, 483 U.S. at 640 (1987) (internal citations omitted) (noting that the right at issue does not have to be defined so precisely that the exact action the officer engaged in has been held unlawful, but it must be "apparent" to the officer that pre-existing law condemned his conduct). In fact, the Police Defendants seemed to have actively avoided the type of conduct directly

---

freed himself from one of the handcuffs, might hit and harm one of the other men or himself. [R. 134-7].

condemned in *Champion* and *Martin*.  The uncontroverted and unanimous testimony of the witnesses is that no one put their weight on Campbell's back or blocked his airways while he was in the prone position.  [*See* R. 128-3 at 29-30; R. 128-5 at 24-27; R. 128-6 at 26-27, 32-33; R. 134-7 at 7; R. 134-9 at 9-10].  Officer Wallace even added that he was monitoring Hatter to make sure he did not do so and noted that he would have removed Hatter if he had put down pressure on Campbell's back.  [R. 128-6 at 25].  Further, there is not even an allegation that the Police Defendants struck Campbell or used pepper spray after he was detained.  Campbell placed himself in the prone position and began to struggle.  The positioning of the Police Defendants and Hatter is consistent with their testimony that they were trying to restrain Campbell for his own safety and the protection of others.  Campbell's Estate has failed to show that the force employed by the Police Defendants constituted a clearly established constitutional violation.  Therefore, qualified immunity protects the Police Defendants, and the Court shall grant summary judgment in their favor on the Estate's claim for excessive force.

2

Campbell's Estate next argues that Officers Wallace and Smith "involved an untrained third party in Roland's seizure creating a situation rising to the level of a state created danger" in violation Campbell's rights under the Fifth Amendment as incorporated to the states through the Fourteenth Amendment.  [R. 143 at 21].  As a general matter, the Due Process Clause of the Fourteenth Amendment does not operate as a "guarantee of certain minimum levels of safety and security."  *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) (citing *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 195 (1987)).  "The purpose of the Due Process clause was to protect the people from the State, not to ensure that the State protected

them from each other." *Id.* There are, however, exceptions to this general rule. Campbell's Estate argues that this case falls into the so-called state-created danger exception, in which "state officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way." *Id.* (citing *DeShaney,* 489 U.S. at 201, 109 S.Ct. 998). The Sixth Circuit has articulated three requirements for the state-created danger theory of due process liability: "an affirmative act that creates or increases the risk, a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 464 (6th Cir. 2006) (citing *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1063 (6th Cir.1998)). Because the Police Defendants have once again defended on the ground of qualified immunity, the Court must first consider whether, when all facts are construed in the light most favorable to the Plaintiffs, Campbell's Estate has shown that the Police Defendants committed a constitutional infraction that satisfies each of these requirements.

Campbell's Estate argues that the affirmative action that the Police Defendants took in this matter was to involve Hatter, a civilian, in the restraint of Campbell. Assuming without deciding that the involvement of Hatter constituted an affirmative action which placed Campbell in special danger, it is clear that record is devoid of evidence that the Police Defendants acted with the requisite level of culpability to justify the application of the state-created danger exception to these circumstances.

"[I]t is not enough to show a causal connection between state action and an act of private violence;" the plaintiff must also "demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *Ewolski,* 287

F.3d at 510. This requires a showing that the government abused its power in a manner that "shocks the conscience." *Id*. (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 848 (1998)). Though this standard is "no calibrated yardstick," it clearly requires a showing beyond mere negligence. *Id*. (citing *Lewis,* 523 U.S. at 847). The appropriate level of culpability that must be shown depends in large part on the circumstances of the case itself. "[T]he critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Id.* (citing *Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 373 (9th Cir.1998)). Under circumstances where the government has "the opportunity for reflection and unhurried judgments," the standard is deliberate indifference. *McQueen*, 433 F.3d at 469 (citing *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir 2003). Courts have often applied this standard to cases in which the relevant conduct occurred in a custodial setting. *See Ewolski*, 287 F.3d at 511. On the other hand, "the deliberate indifference standard 'is sensibly employed only when actual deliberation is practical.'" *Id*. at 510 (citing *Lewis*, 523 U.S. at 851). In situations requiring split-second decision making, such as a high speed vehicle chase, "a Fourteenth Amendment violation occurs only when the police act with malice and an intent to harm." *Id*. at 510 (citing *Lewis*, 523 U.S. at 854).

The parties dispute which of these standards apply. According to the Police Defendants, this is a situation that did not allow for reflection and unhurried judgment. This argument is not without some merit. As previously discussed, when the Police Defendants arrived at Adult Daycare, the disarray of the facility, the appearance of Hatter, and the behavior of Campbell suggested that the situation had been volatile and could become dangerous again, thus

necessitating a swift response. However, viewing the facts in the light most favorable to the Estate, it would appear that some deliberation did actually occur. Officer Wallace engaged in limited discussions with Hatter and then called for and waited on back up to arrive. [R. 128-6 at 4, 16-18]. And while Campbell appeared to be in a volatile state that could result in further danger if not dealt with, Officer Wallace freely admits that he was not an immediate threat to him when he arrived. [R. 128-6 at 6]. Thus, because the Police Defendants had some time to deliberate before involving Hatter in the detention, the standard for measuring whether they demonstrated the requisite culpability under the Fourteenth Amendment is deliberate indifference.

Deliberate indifference, like subjective recklessness, requires a showing that the "official knows of and disregards an excessive risk to [the victim's] health or safety." *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). That is to say, to be found deliberately indifferent:

> "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Having drawn the inference, the official must act or fail to act in a manner demonstrating "reckless or callous indifference" toward the individual's rights. *Landol–Rivera v. Cruz Cosme,* 906 F.2d 791, 797 (1st Cir.1990).

*Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002).

Even under this lower standard, the Police Defendants' decision to involve Officer Hatter in the retention of Campbell could in no way be construed to make out a due process violation. Hatter was not a random stranger from the street brought into the fray to immobilize Campbell and harm him into submission. Hatter was an employee of the facility who worked in crisis management and specifically with Campbell. It was Hatter who had dealt with Campbell in the

past and who had asked for the police to be called for assistance in this situation.    Officer

Wallace explained that he asked Hatter to accompany him to initially restrain Campbell because:

> In this situation, Mr. Hatter was the only person that had any knowledge about who I
> was dealing with and what was going on.  He was also the only person that I know
> that would have had a rapport with this subject or knew how to communicate or what
> this subject's needs were, so any and all infor – or assistance he gave would have
> been helpful to me.

[R. 128-6 at 32].  Officer Wallace was not reckless or exhibiting a callous disregard for

Campbell's individual rights in asking Hatter to accompany him while he handcuffed Campbell.

He simply thought that having someone close by that was familiar with Campbell and his

disability would helpful.  This is a perfectly reasonable belief, which is certainly a far cry from

subjective recklessness or deliberate indifference.

In arguing that the Police Defendants were deliberately indifferent, the Estate takes issue

once again with the fact that the Police Defendants cuffed and restrained Campbell at all,

claiming that this act escalated the scene and led to Campbell's death.  However, these arguments

seem to have little to do with the decision to involve Hatter, which is the basis of the state

created danger claim, and more to do with whether or not the chosen amount of force was

excessive.

As discussed, the Court has already found that the amount of force employed by the

Police Defendants was not excessive under the requisite standards.  To the extent that

Campbell's Estate argues that the Police Defendants recognized that Campbell was in the throes

of excited delirium and violated their own training by restraining someone in that condition, such

an argument is unavailing.  As an initial matter, Officer Wallace expressly stated that he did not

subjectively perceive that Campbell might have experienced excited delirium until after the

incident. [R. 134-6 at 5, 11]. Further, it is difficult for Campbell's Estate to argue that

Campbell's excited delirium should have been obvious to the officers, when there is

disagreement even among the experts as to the nature of Campbell's excited delirium. [*See* R.

160].[7]

Campbell's Estate also claims that the "Defendant police officers placed Roland in a

position in which he was unlikely to be able to breathe properly; allowed and/or invited a third

party who was not an officer to participate in subduing Roland; and at one point the three put

their combined weight of over six hundred pounds on a young man who was five foot five and a

half." [R. 134 at 21]. As an initial matter, this is a gross misstatement of the facts, which cannot

be supported by the evidence in the record. Neither Hatter nor the Police Defendants placed

Campbell in the prone position. The record is clear that Campbell rolled himself into the

dangerous prone position against the wishes of the Police Defendants and Hatter. [R. 128-6 at

20; R. 134-9 at 8]. Though there is testimony that the Police Defendants invited Hatter to

accompany them while they placed him in handcuffs, after Campbell was initially restrained, the

record is clear that the officers did not seek further assistance from Hatter in restraining

Campbell.[8] Officer Wallace noted that, "Mr. Hatter took it upon himself to assist with the

restraining of Mr. Campbell." [R. 128-6 at 35]. Further, Officer Wallace commented, "there was

no request from the officers for [Hatter's] assistance. He took it upon himself." [R. 128-6 at 35-

---

7 The Police Defendant's expert only identifies one episode of excited delirium, while the Estate's expert seems to
argue that the Police Defendants actually started a second episode of excited delirium that killed Campbell. [*See* R.
160]. In addition, Campbell's Estate states on numerous occasions that Campbell was calm when Officer Wallace
arrived on the scene. [R. 143 at 19].
8 According to Officer Smith, when they were approaching Campbell to handcuff him, Hatter asked Officer Smith if
the officers would need him, and Officer Smith responded by simply stating, "possibly." [R. 134-7 at 5]. Hatter
recalls that when he asked the Officers if they wanted him to stay with them as they approached Campbell to cuff
him, they replied, "if you would." [R. 134-9 at 7]. Hatter denies that he participated in the cuffing of Campbell

32

36].  Additionally, as previously discussed, not one of the witnesses to the incident testified that

Hatter was on top of Campbell in a way to impede his breathing, let alone that all three men

were.  [*See* R. 128-3 at 29-30; R. 128-5 at 24-27; R. 128-6 at 26-27, 32-33; R. 134-7 at 7; R. 134-

9 at 9-10].  In fact, the only testimony that suggests that Hatter was on top of Campbell at all is

that of Officer Wallace, who admitted that while he did not have a good view, it was possible

that at one point Hatter was on top of Campbell's lower body.  [R. 128-6 at 27].  Officer Wallace

went on to state that Hatter was "not restricting an airway or in a position that would have

harmed" Campbell, and if he had ever become concerned with Hatter's involvement, he would

have "removed him." [R. 128-6 at 25].

Officers Smith and Wallace had no reason to believe that asking Hatter to accompany

them as they handcuffed Campbell would greatly increase the risk of harm to Campbell.  On the

contrary, the evidence of the record is clear that they believed that Hatter's presence and

familiarity with Campbell would help avoid harm to the decedent.  The record is devoid of any

facts or testimony that support a finding that the Police Defendants requested Hatter to get on the

floor with them to help restrain Campbell, or that once Hatter did the Police Defendants allowed

him to participate in any way that they believed harmful to Campbell.  Thus, there is simply no

evidence that would show the decisions of the police defendants as being subjectively reckless or

made with callous disregard to Campbell's rights.  As Campbell's Estate can make out no clearly

established constitutional violation of the Due Process Clause of the Fourteenth Amendment, the

Police Defendants are immune from the state-created danger claim and summary judgment is

appropriate.

---

beyond helping him get up and providing Campbell's arm to one of the officers.

Campbell's Estate next alleges that Defendant Ronnie Bastin, in his official capacity as Chief of the Lexington-Fayette Urban County Government Division of Police, failed to properly supervise, discipline and control police officers to respond to incidents involving persons with cognitive disabilities.  Further, the Estate claims that these failures constituted policies and customs, which contributed to Roland's injuries and death.

Section 1983 liability must be based on something more than respondeat superior or the right to control employees.  *McQueen*, 433 F.3d at 470 (citing *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1984)); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  In addition,

> "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.' " *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999) (quoting *Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.1982)).  "At a minimum a plaintiff must show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Hays,* 668 F.2d at 874).

*Id.*  As a result, "a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor."  *Id.*; *See also, City of Los Angeles v. Heller*, 475 U.S. 796, 799, (1986) (*per curiam*) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of unconstitutionally excessive force is quite beside the point."); *Claybrook v. Birchwell*, 199 F.3d 350, 361 (6th Cir. 2000) ("Furthermore, because the charged official conduct did not inflict any constitutional deprivation upon Quintana, defendant Kirchner, in his official capacity as the Chief Executive Officer of the Nashville–Davidson County Metropolitan Police Department, cannot be liable to her for any alleged neglect to train or supervise those officers, or failure to

develop appropriate deadly force policies."); *Aull v. Osborne,* 2009 WL 111740, *8

(W.D.Ky.2009) (quoting *Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999)) (internal

quotation marks omitted) ("[F]or a supervisor to be liable under Section 1983, there must have

been an underlying constitutional violation."); *Frodge v. City of Newport*, 501 F. App'x 519, 532

(6th Cir. 2012); *Farmer v. Logan Cnty., Ky.*, 1:09-CV-116-JHM, 2010 WL 4860280 (W.D. Ky.

Nov. 22, 2010); *Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 840 (E.D. Tenn. 2011).

As has been discussed in significant detail, even with the facts construed in the light most

favorable to them, Campbell's Estate has not shown that the actions of Officers Wallace, Smith,

or Bastin constituted a constitutional violation. Therefore, in the absence of an underlying

constitutional violation, the Police Defendants' motion for summary judgment shall be granted as

to the Estate's claim for failure to train.

4

In addition, the Police Defendants also seek summary judgment as to the Estate's claim

against them for destruction of Campbell's power to labor and earn money. This is the second

occasion on which the Police Defendants have made such a motion. Previously, the Court

refused to grant summary judgment as a result of an affidavit from plaintiff's expert Lawrence

Forman, who stated that Campbell did have the capacity to earn money at a sheltered workshop.

[R. 105 at 2]. However, since that time, Campbell's Estate has withdrawn Forman as an expert

in this case. [R. 128-17]. Thus, there remains no evidence in the record to counter the

interrogatories and deposition testimony that indicated Roland Campbell never held gainful

employment and was never expected to do so. Campbell's Estate claims that this issue is not yet

ripe and that a different expert, Dr. Guy Caruso, will testify that Campbell had the capacity to

work.  However, the discovery deadlines have passed and Dr. Caruso's reports are completely devoid of such an opinion.  [R. 130-2; R. 130-3].  Further, as was made clear at the evidentiary hearing, Dr. Caruso intends to testify concerning autism generally, and would not have the requisite basis to opine as to the specific issue of whether Roland Campbell had power to labor and earn income such that the Police Defendants could destroy it.  There being no more dispute of material fact, the Court shall grant the Police Defendants' motion for summary judgment as to the Estate's claim for destruction of Campbell's power to labor and earn income.

III

The circumstances of Roland Campbell's death are tragic.  Further, the actions taken by the Police Defendants immediately before his death are certainly not above scrutiny.  Perhaps, as the Estate's expert suggests, the officers should not have approached Campbell or handcuffed him at all.  Perhaps, the involvement of three men, one of whom was not a police officer, might have been unnecessary to ensure that Campbell did not pose a danger to himself or others. Perhaps the Lexington-Fayette Urban County Government Division of Police could have had in place better policies that could have helped avoid these circumstances.  However, in the context of Section 1983 claims, these are not the dispositive inquiries.  Whether or not the actions of the Police Defendants were questionable, so long as they did not violate the United States Constitution, qualified immunity protects them from liability.  The amount of force used by the officers was not excessive under the Fourth Amendment because it was objectively reasonable under the circumstances.  Further, the decision to involve Hatter does not violate the Fourteenth Amendment because there is no evidence that it was made with deliberate indifference to Campbell's rights.   Without underlying constitutional violations by the individual officers, the

claims for failure to train cannot impute liability to Chief Bastin or the Police Department. Thus, while Campbell's Estate may disagree with the actions of the Police Defendants, it has no legal recourse against them under the Constitution of the United States.

Accordingly, and for the aforementioned reasons, it is hereby **ORDERED** as follows:

(1)     The Police Defendants' Motion for Summary Judgment [R. 128] is **GRANTED**;

(2)     The Plaintiff's Motion for Partial Summary Judgment [R. 134] is **DENIED**;

(3)     The Motions for a telephonic status conference to schedule a new trial date [R. 169, 170] are **DENIED** as moot;

(4)     The Pretrial Conference set for February 18, 2014 and the Jury Trial set for March 3, 2014 are **CANCELLED**;

(5)     There being no remaining claims, this matter is **STRICKEN** from the active docket; and

(6)     A separate **JUDGMENT** shall enter.

This 10th day of February, 2014.

Signed By:

*Gregory F. Van Tatenhove*

United States District Judge